MAY CHANDLER GOODAN, PETITIONER, ET AL.,* *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3033, 3036, 3037, 3038, 3039, 3040, 3041.   Promulgated May 23, 1949.

*Proceedings of the following petitioners are consolidated herewith: Marian Otis Chandler; Norma Chandler; Philip Chandler; Constance Chandler Crowe; Helen Chandler Garland; and Ruth C. Williamson.

*William Galbally, Jr., Esq., A. Calder Mackay, Esq.,* and *Adam Y. Bennion, Esq.,* for the petitioners.
*B. H. Neblett, Esq.,* for the respondent.

OPINION.

ARNOLD, *Judge*: These consolidated cases involve income tax deficiencies as follows:

| Petitioner | Docket No. | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|
| May Chandler Goodan | 3033 | $948.67 | $22,609.55 | $1,897.63 | $1,346.77 |
| Marian Otis Chandler | 3036 | 65,870.01 | 8,995.62 | 14,114.00 | 7,755.73 |
| Norman Chandler | 3037 | 5,861.44 | 3,162.91 | 4,506.34 | 9,382.14 |
| Philip Chandler | 3038 | 1,263.65 | 1,577.23 | 1,933.15 | 2,251.08 |
| Constance Chandler Crowe | 3039 | 2,456.66 | 2,066.75 | 3,106.89 | 1,866.62 |
| Helen Chandler Garland | 3040 | 1,138.18 | 1,028.68 | 2,084.37 | 935.39 |
| Ruth C. Williamson | 3041 | 937.67 | 2,658.92 | 1,737.50 | 691.24 |

The parties stipulated that there is no penalty liability under section 293 (a), Revenue Act of 1938, for the taxable year 1938 in Docket No. 3037.

Numerous issues have been settled by the parties, with the result that a single issue, common to each case for each taxable year, remains for decision, namely, whether certain taxable stock dividends received by a trust are taxable to the trust or to its grantors, seven of whom are petitioners herein.

The parties have stipulated the amount of the deficiency in each case for each taxable year if we decide the sole issue in favor of the respondent. The parties have also stipulated the amount of the deficiency or overpayment in each case for each taxable year if we decide the sole issue in favor of the petitioners. The parties have stipulated all the facts deemed pertinent hereto. Their stipulation is incorporated herein by reference and the pertinent facts are summarized hereinafter.

The income tax returns for the years involved herein were filed with the collector of internal revenue for the sixth district of California.

The trust involved herein, Chandler Trust No. 2, was created on June 26, 1935, by the execution of a trust agreement. The petitioners herein and Harrison G. O. Chandler executed the agreement as trustors and as trustees. At no time since its execution has the trust agreement been altered, amended, or modified.

Marian Otis Chandler is the mother of Harrison G. O. Chandler and the other 6 petitioners. At June 26, 1935, she was 68 years of age, her children ranged from 42 to 28 years of age, and her 13 grandchildren from 18 years to 2 months. All of these individuals are living at the present time, except one grandchild, who died in June 1943.

At the time the trust agreement was executed Marian Otis Chandler conveyed to the present trustees and their successors 16,536 shares of stock of Chandis Securities Co., hereinafter referred to as Chandis. Each of the other 7 trustors conveyed to the present trustees and their successors a certificate representing 50 shares of stock of the Times-Mirror Co., hereinafter referred to as the Times, and two certificates representing 2,694 shares of stock of Chandis.

The certificates of stock were endorsed by the respective trustors on June 27, 1935, and delivered to the Times and Chandis for cancellation. A new certificate representing 350 shares was issued by the Times and a new certificate representing 35,394 shares was issued by Chandis in the names of and delivered to the trustees on June 27, 1935. From that date to the present time the trustees have kept the certificates.

The trust indenture, after specifically naming petitioners and Harrison G. O. Chandler as "the trustors," as "the 'present Trustees,'" and as "the 'present beneficiaries,'" provided in part and in summary as follows:

WITNESSETH

That, Whereas the Trustors deem it to be for their best interests, and for the best interests of The Times-Mirror Company and the Chandis Securities Company, that there should be a continuity and stability of policy and management, and to that end that the interests of each of the Trustors in said corporations, as evidenced by the stock severally held by them, be united and vested in the Trustees, as hereinafter provided; and

Whereas, the Trustors deem it also to be for their best interests that there should be held, conserved, administered and eventually distributed, according to the terms hereof, those assets which are respectively contributed by them to the Trust Estate;

\*     \*     \*     \*     \*     \*     \*

Article I of the trust indenture segregated the trust corpus into two parts. It provided that one part:

\* \* \* shall consist of all of the shares of capital stock of The Times-Mirror Company delivered to the Trustees hereunder, and the other part shall consist of all of the shares of the capital stock of Chandis Securities Company delivered to the Trustees hereunder, and such division and segregation shall be continued throughout the term of this trust.

The legal title and the equitable title to the trust estate were vested in the trustees and no interest therein "is, or at any time shall be, deemed to be vested in any of the beneficiaries hereunder. The interests of the beneficiaries shall at all times consist only and solely of the right to enforce the due performance of this trust."

Article II dealt with the gross income from the trust. It provided that gross income from each division of the trust estate (the Times stock and the Chandis stock) should be charged with the taxes, costs, charges, and expenses applicable to administering, protecting, and

distributing that portion of the trust estate. General and indirect costs, charges, and expenses were to be allocated to the two parts as the trustees determined.

Article III dealt with the distribution of the net income. It provided that the "entire net income received from the trust estate and available in cash for distribution, shall be paid in monthly, quarterly, or other convenient installments" as the trustees might from time to time determine, the net income from the Times stock to be distributed in equal shares to the 7 individuals who contributed that stock and the net income from the Chandis stock to be distributed during their lives, 16,536/35,394 to Marian Otis Chandler and 2,694/35,394 to each of the other 7 trustors.

Article III also provided as follows:

> There is hereby expressly reserved to each of the Trustors, during his or her lifetime, the absolute power of appointment and disposition of his or her share of the principal and income of the Trust Estate after his or her death, the same to be exercised not by Will, but only by the last written instrument exercising such power on file with the Trustees at such Trustor's death. Such power may be exercised, but only in the manner herein specified, from time to time, and each exercise thereof may be similarly revoked.

Failing such appointment and disposition so on file at the time of trustor's death, the trust income to which a deceased trustor would have been entitled was to be distributed to his or her spouse for life, then to their issue, if any, then to the living heirs of such trustor, during their respective lives until termination of the trust. Similarly, the trustor's share of principal upon termination of the trust was vested in and distributable to his or her then living issue in equal shares, *per stirpes;* if none survived, then to the living heirs at law, the identity and respective shares of which were to be determined by California law in force at the time of the trustor's death.

Article IV provided that the trust "shall cease upon, and in no event shall its duration extend beyond, the death of the last survivor of the following named persons * * *" The 21 persons named in the trust indenture were the 8 trustors and 13 grandchildren, whose ages ranged from 68 years to 2 months, as above mentioned.

Article V, entitled "As to Trustees," provided that when the "present Trustees" should have been reduced to three in number, the survivors should appoint and constitute additional trustees, so that there would always be, except for temporary vacancies, 7 trustees until the termination of the trust. The additional trustees were to be selected, so far as possible, from the then beneficiaries of the trust, "giving preference to those who may be executives of" the Times and Chandis, "so long as shares of stock of the respective companies are held in the Trust Estate." Other persons, including a bank or trust company, could be selected as additional trustees, but a majority of the trustees who were

at the same time beneficiaries could remove any or all of such other persons. Long continued absence from California or the county of Los Angeles, incapacity, or inability to act constituted a valid reason for removal of any trustee by the remaining trustees, whether a beneficiary or not. Except in instances where unanimity of determination by trustees who were also beneficiaries was specifically provided, the decision of a majority of the trustees was to be deemed the decision of all. The trustees should choose from their number a chairman and a secretary, one or more special custodians of funds or property, and one or more for the collection and disbursement of funds of the trust estate. The trustees were authorized to appoint other agents, depositaries, auditors, advisers, brokers, attorneys, and other consultants. They were required to adopt rules of procedure for their meetings, keep records thereof, fix regular places and times for meetings, with provision for notice thereof, all as they might from time to time determine in the efficient administration of the trust estate. The books of account, minutes of meetings, and other records of the trust were to be subject to inspection to such extent as the trustees might from time to time determine.

Article VI, entitled "Powers of the Trustees," provided as follows:

The Trustees are specifically empowered to receive and collect the principal and income of the Trust Estate, invest and reinvest the principal available therefor, and as hereinabove provided, to pay, accumulate, use and apply the income, and at the termination of the trust, to distribute the principal of the Trust Estate.

To carry out the express purposes of this trust, and in aid of its execution, and the proper administration, management and distribution of the Trust Estate, the Trustees are vested with the following additional powers and discretions:

(1) The shares of stock The Times Mirror Company, hereinabove described, and the shares of stock of Chandis Securities, hereinabove described, shall be sold, exchanged or otherwise disposed of only by the unanimous decision of the present or succeeding Trustees herein named; after the present and succeeding Trustees herein named are reduced to three in number, by the unanimous decision of the Trustees who are then beneficiaries hereunder;

(2) Similar unanimity shall be required for a determination of the Trustees to borrow upon or pledge, or in any manner hypothecate or alienate or transfer or otherwise dispose of any interest in or to said shares. No portion, or less than the entire number of said shares, shall be sold, pledged, or otherwise disposed of, except in the event of such emergency that such partial disposition shall serve to avert the loss of the whole, or to protect the remaining shares.

In aid of the determination to be arrived at by the Trustees in the situations herein contemplated, it is the Trustors' desire and request that the powers herein conferred, which are contingent upon the unanimous decision of the Trustees, shall be exercised only to maintain such a proportionate interest as is now represented in The Times Mirror Company and Chandis Securities Company, or in the event of an emergency, to protect as much thereof as may be possible under such circumstances;

(3) It being the desire of all the parties hereto that Norman Chandler shall eventually succeed to the position of President and General Manager of The

Times Mirror Company, the Trustees shall vote said shares for such Directors as will carry out this desire. The unanimous decision of the Trustees shall be required in order to vote for such Directors as will not choose Norman Chandler as the President and General Manager of The Times Mirror Company, but if it should be unanimously determined that some one other than Norman Chandler shall be President and General Manager of The Times Mirror Company, then a decision by a majority of the Trustees shall be sufficient to choose his successor;

(4) The unanimous decision of all the Trustees shall be requisite to exercise the following powers with reference to the stock of The Times Mirror Company and Chandis Securities Company, so long as it shall constitute a part of the Trust Estate:

(a) To vote for any increase of capitalization of The Times Mirror Company and/or Chandis Securities Company, which increase is proposed to be sold to the stockholders, or others, and not issued by way of stock dividend;

(b) To vote for or consent to the incurring of any bonded indebtedness or other long term loan which requires the approval of stockholders, or shall be submitted to them;

(c) To vote for or consent to any new classes of stock, or any reclassification of stock which might vary the rights of stockholders as to voting or other preferences;

(d) To enter into any voting trust or other lawful agreement with other stockholders for the purpose of concentrating or unifying the control of stock of The Times Mirror Company and/or Chandis Securities Company, and to deposit shares under such agreement;

(5) The Trustees, if the shares of stock of The Times Mirror Company and/or Chandis Securities Company should be sold or otherwise disposed of, or if there should be any liquidation, partial or otherwise, of the assets thereof, or a distribution to the stockholders thereof of any proceeds of sale as a result of which assets of substantially different character are received by the Trustees, then and in that event, but not otherwise, are vested with the following additional powers and discretions:

(a) To retain such property and to continue to operate any business in connection therewith for such time as the Trustees may deem advisable or expedient;

(b) To manage, control, sell, convey, exchange, or otherwise dispose of, or partition, divide, sub-divide, improve or repair such property and in connection with its disposal, to grant options and to sell upon deferred payments;

(c) To borrow upon, mortgage, pledge, or otherwise encumber such property;

(d) To lease such property, or any part thereof, for terms extending beyond the duration of this trust, and to grant for like terms the right to mine, or drill for and remove therefrom gas, oil and other minerals;

(e) Respecting bonds, shares of stock and other securites, notes, accounts and other choses in action, to have and exercise all the rights, powers and privileges of an owner ,including (though without limiting the foregoing) voting, giving of proxies, payments of assessments and other sums deemed by the Trustees to be expedient for the protection thereof, assenting to corporate sales, leases and encumbrances, participating in voting trusts and pooling agreements, selling or exercising stock subscription or conversion rights, participating in foreclosures, reorganizations, mergers and liquidations, and in connection therewith depositing securities with protective or other committees, on such terms as the Trustees may deem expedient; to sue upon or otherwise enforce collection of any note or other obligation, or to compromise any claim or demand based thereon;

(f) To invest such principal receipts as are in the form of cash in conservative securities to such an extent as the Trustees shall deem advisable or expedient,

but such investment of cash shall not be limited to conservative securities if the Trustees shall deem that any one or more of the following courses shall better protect the Trust Estate, or shall be more conservative as providing for a greater diversification:

(1) To purchase property, whether real or personal, to such extent as the Trustees may deem expedient or desirable, as providing protection from the possibility of monetary disorders or securities devaluations or deflations, or monetary or other inflation, or to avert or lighten onerous taxes or other Governmental charges;

(2) To make such conservative loans or advances upon collateral or upon real estate for such term, either within or extending beyond the duration of this trust and at such rate of interest as the Trustees may deem to be for the best interests of the Trust Estate;

The enumeration of those certain powers and discretions of the Trustees, as are set out in this Paragraph (5), shall not be construed as limiting the general powers and discretions herein vested in the Trustees, it being the intent of the Trustors that in the events provided for in this Paragraph, the Trustees shall have, and they are hereby vested with, all of the powers and discretions that an absolute owner of property has or may have.

(6) Regardless of the character of the Trust Estate, the Trustees shall have the following general powers and discretions:

(a) To determine in their discretion what is principal of the Trust Estate, gross income or net distributable income therefrom; except that all bonuses, royalties and recoveries from mines, gas or oil leases or wells, all stock dividends and proceeds of sale of stock rights and all gain or loss which may result from the payment, retirement or sale of stocks, notes, bonds or other securities, or on foreclosure or other realization upon mortgages and trust deeds, shall inure to or fall upon principal, and all cash dividends (other than liquidating dividends stated in writing to be such by the corporation paying the same, or proved to the satisfaction of the Trustees to be such prior to its disbursement thereof) shall go to income of the Trust Estate. The net income from real property acquired by the Trustees on or by acceptance of conveyance in lieu of foreclosure, shall go to income of the Trust Estate. Brokers' or other commissions and expenses on purchase or sale of trust property shall be charged against principal;

(b) To hold property of the Trust Estate in their own names, or in the names of one or more of their number, or in the name of their nominee, with or without disclosing such fiduciary relationship;

(c) To appoint or employ servants, including agents, auditors, brokers, attorneys and other consultants and advisers, and provide for their compensation;

Any Trustee who is not a beneficiary may receive such reasonable compensation for his services as Trustee, as the remaining Trustees may agree upon at the time of his or its appointment. Any Trustee may be compensated for any special or extraordinary or unusual services if such compensation shall be agreed upon in advance of the rendition of such services;

(d) The Trustees may maintain and administer the Trust Estate undivided and as a unit, and shall not be required to make physical division or segregation thereof, except if, when and to the extent required to make distribution thereof, as in this trust provided, but the Trust Estate shall be deemed to be theoretically divided into as many units as there are beneficiaries and in proportion to their respective interest in the income;

(e) To allot, partition and distribute the Trust Estate for such valuations and according to such method or procedure as the Trustees may determine

upon, and to do so in kind, or partly in kind and partly in money, according to their valuation thereof;

(f) To construe this agreement, and the construction of the same made in good faith shall be final, conclusive and binding upon all beneficiaries;

All discretions in this trust conferred upon the Trustees shall, unless specifically limited, be absolute and their exercise shall be conclusive on all persons interested in this trust or the Trust Estate.

Article VII, entitled, "Liabilities of the Trustees," specified that the trustees should assume no personal liability in respect of any action taken by them, except for his, her, or its own gross negligence or willful misconduct. It also provided that any trustee might be a member, shareholder, director, officer, or trustee of any other corporation, firm, trust, or association with which the trustees might deal; might become pecuniarily interested in any matter or transaction to which the trustee might be a party, provided the nature of such relationship was fully disclosed to the remaining trustees; might buy from, sell to, or deal with the trustees so long as a majority of all the trustees had notice of such interest of such trustee in the transaction and should approve thereof. The trustees were to render to the beneficiaries an annual statement of receipts, disbursements, and assets as soon after the close of the fiscal period as practicable. The approval of such account by the adult beneficiaries competent to act constituted a full and complete acquittance and discharge of the trustees as to the transactions, receipts, and disbursements reflected therein.

Article VIII was entitled "As to Beneficiaries." It contained provisions restraining each beneficiary from alienating, anticipating, encumbering or in other manner assigning his or her interest, and other provisions common to so-called spendthrift trusts. It also provided in part as follows:

If any beneficiary shall, either directly or indirectly, singly or in conjunction with other persons, seek to establish or assert any claim to the Trust Estate or to the income therefrom except as is herein specifically provided, or shall attempt to impair, invalidate or set aside any of the provisions hereof, or to have the same or any part thereof declared void or diminished, or to defeat or change any part of the plan of administration and distribution, as contemplated hereby, or shall attempt to settle or compromise, directly or indirectly, either in or out of court, with any persons seeking so to do, or shall consent or acquiesce in. or fail to contest such proceedings, then and in that event, anything to the contrary hereinabove stated notwithstanding, such person or persons shall thereupon cease to have any further interest or estate hereunder and the interest or share which would otherwise have gone to such person or persons shall go to augment the share or shares of those who shall not have joined in, assisted, consented to or acquiesced in such proceedings.

The beneficiaries hereunder shall have no control or authority over the Trustees in any particular whatsoever, their entire interest hereunder being to receive the income, and at the termination of this trust, the principal, in the manner and to the extent determined by the Trustees. The acts of the Trustees

and the powers and discretions herein vested, shall, except for lack of good faith, be conclusive upon all beneficiaries hereunder.

Article IX was entitled "General Provisions." It provided that persons dealing with the trustees should not be required to see to the application of the purchase money or other consideration passing to the trustees and were not required to see that the terms of the trust were complied with. The provisions of the trust agreement were declared to be severable, and the adjudged invalidity of any provision was not to affect the remaining provisions of the trust agreement. The concluding paragraph of article IX provided in part as follows:

This agreement and each and every provision hereof shall be, and is hereby, declared to be irrevocable and cannot be terminated by the parties hereto, by the beneficiaries hereunder, or by any court or otherwise, prior to the expiration of its full term, as herein fixed;

Provided, however, that the Trustors, during their joint lives, have reserved, and do hereby reserve, the right by their unanimous agreement in writing and filed with the Trustees to modify, amend, construe, define or otherwise vary the terms of the provisions of Articles II, III, V, VI, VII, and IX hereof, but no such modification shall be effective, directly or indirectly, to change the provisions as to the duration of this trust or the initial character of the Trust Estate, as provided in Articles I, IV, and VIII, the provisions of which last numbered Articles shall in all respects and in each and every provision thereof be and remain irrevocable.

The total property owned by the trust during the taxable years consisted of (a) a small amount of principal cash ($607.83 during 1938 and 1939, and $7.83 during 1940 and 1941), (b) 350 shares of stock of the Times, (c) 35,394 shares of common stock of Chandis, and (d) shares of preferred stock of Chandis as follows:

Dec. 31, 1937_____ 884 shares
Dec 31, 1938_____ 1,591 shares
Dec. 31, 1939_____ 2,304 shares
Dec. 31, 1940_____ 3,011 shares
Dec. 31, 1941_____ 3,541 shares

The gross cash receipts and expenditures of the trust for each of the taxable years were as follows:

|  | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|
| *Gross cash receipts* | | | | |
| Dividends on Times stock | $26,950.00 | $32,375.00 | $35,000.00 | $35,000.00 |
| Dividends on Chandis stock | 62,918.30 | 54,343.81 | 62,501.23 | 77,692.39 |
| Total | 89,868.30 | 86,718.81 | 97,501.23 | 112,692.39 |
| *Expenditures* | | | | |
| Office expense | 303.40 | 295.80 | 299.86 | 295.80 |
| California state income tax | 6,292.03 | 4,420.00 | 4,420.00 | 4,617.76 |
| Total | 6,595.43 | 4,715.80 | 4,719.86 | 4,913.56 |
| Net | 83,272.89 | 82,003.01 | 92,781.37 | 107,778.83 |

The office expenses set forth above represented compensation paid for part time clerical services in keeping the trust's books and records.

During the taxable years the trust received, as taxable stock dividends on its Chandis common stock, the following number of shares of Chandis preferred stock, which had a fair market value equal to its par value:

| Year | Preferred shares | Fair market value |
|---|---|---|
| 1938 | 707 | $70,000 |
| 1939 | 707 | 70,700 |
| 1940 | 707 | 70,700 |
| 1941 | 530 | 53,000 |

The trust reported the taxable stock dividends, and it paid income tax for each of the taxable years as follows:

| | |
|---|---|
| 1938 | $27,220.00 |
| 1939 | 17,942.00 |
| 1940 | 17,942.00 |
| 1941 | 26,404.40 |

The income taxes were paid with cash contributed by petitioners in accordance with their respective interests in the trust.

The net cash income distributable and distributed under the terms of the trust agreement to the respective beneficiaries which was reported by the beneficiaries in their respective income tax returns and upon which they paid individual income taxes, was as follows:

| | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|
| Marian Otis Chandler | $26,442.77 | $23,273.78 | $27,079.86 | $34,085.00 |
| May C. Goodan | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Ruth C. Williamson | 8,118.59 | 8,389.89. | 9,385.93 | 10,527.69 |
| Helen C. Garland | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Harrison Chandler | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Philip Chandler | 8,118.57 | 8,389.89, | 9,385.93 | 10,527.69 |
| Norman Chandler | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Constance C. Crowe | 8,118.58 | 8,389.89 | 9,385.93 | 10,527.69 |
| Total | 83,272.87 | 82,003.01 | 92,781.37 | 107,778.83 |

The principal business of the Times is, and since 1881 has been, the publication of "The Los Angeles Times," a newspaper with daily morning and Sunday editions. It has one class of stock, of which 5,760 shares were outstanding during the taxable years and for more than 10 years prior to June 26, 1935. At all times since 1884 a majority of the stock of the Times has been owned, directly or indirectly, by the father of Marian Otis Chandler, General Harrison Gray Otis, and his descendants. Immediately prior to the creation of the trust on June 26, 1935, shares of stock of the Times were owned as follows:

| Stockholder | Shares held | Stockholder | Shares held |
|---|---|---|---|
| Marian Otis Chandler | 1,634 | Norman Chandler | 100 |
| May C. Goodan | 50 | Estate of Frances C. Kirkpatrick | 50 |
| Ruth C. Williamson | 50 | Harry Chandler | 3 |
| Helen C. Garland | 50 | Chandis Securities Co | 1,935 |
| Harrison G. O. Chandler | 50 | Others | 1,738 |
| Philip Chandler | 50 | | |
| Constance Chandler | 50 | Total | 5,760 |

Chandis, which was a personal holding company during the years involved herein, was organized in 1916. On June 25, 1935, its outstanding stock consisted of 38,288 shares of common stock. Of these, Marian Otis Chandler owned 16,536 shares, her 7 living children and the estate of her deceased daughter each owned 2,694 shares, and Harry Chandler owned 200 shares. Preferred stock of Chandis was first authorized and issued in 1937, and on December 31, 1941, there were 5,954 shares of the preferred stock outstanding. The purpose of Chandis in authorizing and issuing taxable stock dividends during the taxable years was to enable it to obtain dividends paid credits and at the same time retain a portion of its earnings in order to liquidate its outstanding obligations and those of its wholly owned subsidiary, Southwest Land Co.

These consolidated cases present a single question of law, namely, whether the taxable stock dividends are to be taxed to the trust or to the grantors, seven of whom are petitioners herein. The trust reported the taxable stock dividends as its income and paid the tax thereon. The petitioners reported none of the taxable stock dividends in their income tax returns. The respondent determined that the dividends should be taxed proportionately to the trustors. His determination accounts for a portion of the deficiency of each petitioner in each taxable year.

A general statement of the opposing positions will be helpful in understanding the points hereinafter discussed. Respondent's brief states that:

* * * for practical purposes it must be recognized that these eight individuals, all members of a family, constitute a single group whose interests are similar, and it is highly artificial and unrealistic to pretend that the members of this group have three different interests or motives when acting in their various capacities as trustors, trustees, and beneficiaries. These eight individuals, seven of whom are petitioners herein, have retained, in one capacity or another, either as individuals or as a group, all of the important attributes of outright ownership of the property.

Petitioners' position may be briefly summarized as follows: Chandler Trust No. 2 was created for reasons diametrically opposed to the purposes which prompted the establishment of the Clifford-type trust. The eight trustors were adult members of the Chandler family. They owned certain capital stock outright, with all the attributes of owner-

ship. When they individually transferred this property to the trust, they relinquished many of these attributes of ownership. Thereafter, they were no longer outright owners of the stock, but life tenants, with powers to appoint the remainders. Thereafter, each was committed to support Norman Chandler for active management of the Los Angeles Times during his lifetime unless all agreed otherwise, including Norman Chandler. The purpose of the trust was to surrender and relinquish the unlimited rights of ownership previously enjoyed by each individual petitioner and trustor.

The first disputed point is whether a valid trust was created. Petitioners contend that a valid trust was created under the laws of California. They cite various California cases in support of their contention, most of which were considered in *Bixby* v. *California Trust Co.* (1948), 190 Pac. (2d) 321. Respondent also cites and relies upon the latter case in support of his contention that the trust can be revoked by the unanimous action of the eight trustors. Respondent's theory, as we understand him, is that, since the trustors by acting in unison might terminate the trust and take down the taxable stock dividends, the dividends are taxable proportionately to them.

Petitioners contend that no one of the trustors, nor all of them together, could terminate the trust, for the simple reason that it would be impossible to obtain the consent of all parties in interest under the law of California. The respondent says that "all parties in interest" whose consent must be obtained under California law to terminate the instant trust, means only the eight individual trustors, trustees, and "present beneficiaries." Our question then is to decide whether California law recognizes that there are parties in interest other than those eight individuals.

In the *Bixby* case, *supra*, the trustor created a trust the income of which was payable to himself for life, and upon his death the trustee, California Trust Co., was to distribute the trust corpus to his heirs at law in accordance with the laws of succession then in effect in California. Bixby sued in equity to terminate the trust, claiming he was the sole beneficiary, and, as such, was entitled in equity to a decree of termination. It was stipulated that Bixby had a wife, a father, a mother, and sisters living. The California court, after careful consideration of the decided cases in California and elsewhere, held that Bixby was not the sole beneficiary of the trust; that he had reserved a life estate in himself, with contingent remainders to his heirs, who took by purchase and not by descent; that until the death of the creator no person could answer the description of heir; and that the trust could not be terminated without the consent of such beneficiaries.

In the *Bixby* case no power of appointment was retained by the creator or trustor. But in *Gray* v. *Union Trust Co.*, 171 Cal. 637; 154 Pac. 306, the trustor transferred the property in trust for her lifetime

and reserved a power of appointment exercisable by will. The trust agreement provided that in default of appointment the trust corpus should go to her heirs at law according to the laws of succession then existing. The trustor was entitled to the net income. The trust was to terminate at the trustor's death. The trustor sought the aid of equity to terminate the trust. The California court refused to terminate the trust, holding, *inter alia*, that the trust created vested remainders in trustor's heirs, subject to divestiture only upon her exercise of the power of appointment by will. The court pointed out that the trustee owed precisely the same duty to protect the rights of the indeterminable class of beneficiaries as to protect the rights of the named beneficiary, the trustor.

These consolidated cases present in each instance a situation where one trustor transferred property in trust to eight trustees, the income from his proportionate part of the corpus to be paid to him for his lifetime. After his death the income was to go to his spouse for life, then to their issue, if any, and then to the living heirs of the trustor during their respective lives until the trust terminated. The trustor gave his share of the trust corpus upon termination of the trust to his then living issue in equal shares, *per stirpes*, and, if none survived, then to his living heirs at law in accordance with the laws of succession of California in force at the time of the trustor's death.

We are convinced by the cited and other authorities that petitioners created with the trust vested remainders in their heirs; that no person answering the description of "heir" can be determined until the death of the trustor; that under such circumstances it is impossible to secure the consent of all parties in interest to a termination of the trust; and that in the absence of such consent a court of equity would refuse to terminate the trust.

The power of appointment reserved by each trustor does not, in and of itself, prevent the vesting of the remainders created by the trustor. Section 781 of the California Civil Code provides specifically that a "general or special power of appointment does not prevent the vesting of a future estate limited to take effect in case such power is not exercised." See also *Gray* and *Bixby* cases, *supra*. Any exercise of the power of appointment by writing filed with the trustees can be revoked by a subsequent writing, and it can not be said until a trustor's death whether trust income and corpus will go according to the trust indenture or according to his duly exercised power of appointment. But, until such time as the remaindermen are divested of their interests as provided in the trust indenture, they are beneficiaries of the trust who are entitled to take after the falling in of the life estate.

Respondent further contends that the trust is not valid for the reason that the trustors can, by the exercise of the right of amend-

ment or modification reserved in article IX, bring about the termination of the trust. The right as reserved is set forth in our findings. Reference thereto discloses that this right and the exercise thereof is extremely limited. In the first place, the right existed only during the joint lives of the trustors. In the second place, the trustors could exercise the right only by unanimous agreement among themselves. In the third place, the right could be exercised only with respect to specified articles in the trust instrument, one of which, article III, is involved in respondent's present contention. A fourth limitation provided that no modification should be effective which directly or indirectly changed the duration of the trust or the initial character of the trust estate as provided in articles I, IV, and VIII. And, finally, the provisions of the last mentioned three articles were in all respects, and in each and every provision thereof, irrevocable.

The limitations placed upon the individual trustor's right to amend or modify certain articles of the trust agreement were sufficient, in our opinion, to prohibit action in concert by the eight trustors to accomplish indirectly that which they could not accomplish directly. Any modification or amendment that would indirectly permit them to terminate the trust was banned by the trust indenture. The California authorities show that any contingent remainderman under the present trust could ask, and would receive, the aid of a court of equity to protect his beneficial interest if the trustors sought to extinguish his rights by terminating the trust.

When the trust provisions are read in the light of the above rules, we are convinced that the trustors could not have terminated the trust by amendment or modification of its provisions so as to exclude all beneficiaries except themselves. We are further convinced that the trustors manifested an intention to, and did, give beneficial interests in the trust income and corpus to persons other than themselves, and that some of such beneficiaries therein designated were indeterminable and could not, therefore, have consented to the termination of the trust. Since all the parties in interest could not have consented to the termination of the present trust, the rule contended for by respondent is inapplicable.

Respondent does not contend that either the trustors or the trustees had any power or discretion to make any distribution of the stock dividends to the present beneficiaries.

Respondent also contends that the trust is invalid for the reason that petitioners' interests in the trust are subject to the claims of creditors. He contends that the spendthrift trust provisions contained in article VIII are, under the present circumstances, contrary to public policy and are invalid under California law, citing *McColgan* v. *Magee*, 172 Cal. 182; 155 Pac. 995, and sec. 175, 25 Cal. Jur. 325. The rule in California, as in many other jurisdictions, is that where an indi-

vidual conveys property to trustees and provides that the income shall be paid to himself, free of the claims of creditors, the attempt to evade his creditors' demands is ineffectual, and the property is subject to execution against him to the same extent as property of which he has retained the legal title. *McColgan* v. *Magee*, *supra*. The rule does not depend upon any fraudulent intent of the trustor, but applies irrespective of his intent. *Bixby* v. *California Trust Co.*, *supra;* *McColgan* v. *Magee*, *supra*.

Apparently respondent's theory, although not so stated, is that, since the trust is invalid as to petitioners' creditors, it is invalid for all purposes. The *McColgan* case, upon which he relies, does not so hold. *Bixby* v. *California Trust Co.*, *supra*. The latter case specifically holds to the contrary. Here, as in the *Bixby* case, there is no evidence that the trust was created for the purpose of defrauding creditors. Had the trust been created for that purpose, the petitioners could not take advantage of their "own wrong in a court of equity to compel termination or extinguishment of the trust on that ground," 190 Pac. (2d) 321, 329. Here, as in the latter case, the declaration of trust created contingent remainders. Equity treats the trust as void only in so far as it operates to defeat the claims of petitioners' creditors. "In all other respects it is valid and its purposes have not been accomplished." *Id.*, p. 329. Since the petitioners can not revoke the trust and the rights of creditors invalidate the trust only with respect to the creditors' claims, without otherwise affecting its validity, we hold that for tax purposes a valid trust was created.

The second, third, and fourth points in dispute are whether petitioners should be taxed on the stock dividends under, respectively, section 22 (a), 166, or 167 of the Revenue Act of 1938 and the Internal Revenue Code. Petitioners rely upon *Lady Marian Bateman*, 43 B. T. A. 69, as affirmed by the Circuit Court of Appeals for the First Circuit, 127 Fed. (2d) 266. Respondent relies upon *Stanley J. Klein*, 4 T. C. 1195; affirmed per curiam (CCA–3), 154 Fed. (2d) 58; certiorari denied, 328 U. S. 869. He distinguishes the *Bateman* case and contends that the trustors, individually or as a group, retained such important attributes of outright ownership of the property that they were the owners of the stock dividends in any event.

In the *Bateman* case the settlor created a trust which reserved to her a life interest in a portion of the trust income and a power to appoint the corpus effective upon her death, and provided that each year 5 per cent of the net income of the trust should be added to corpus. In the taxable years 1935 and 1936 the settlor received 95 per cent of the trust income. Respondent determined that she was taxable upon the *entire* net income of the trust under section 22 (a), 166, or 167 of the applicable revenue acts. The settlor appealed, and we held that she was not taxable upon the 5 per cent accumulated

annually as a part of the trust corpus under any of the cited statutory sections, and the Circuit Court of Appeals for the First Circuit affirmed.

We can not agree with the distinctions suggested by the respondent. The trust herein had as its principal purpose the family control of the Times stock so that Norman Chandler would be assured the presidency and general managership of the Los Angeles Times. This was a business, and not a tax avoidance, purpose. The receipt by the trustor beneficiaries of substantially the same cash income from the trust as they would have received had the property not been conveyed in trust also refutes the respondent's suggestion that the trust was created for tax avoidance purposes. Nor are we impressed with the suggested distinction that each trustor did not convey to independent trustees. It is true that each trustor was a member of the Chandler family, but it is also true that each was an adult member of that family. The trust was not dominated by one or both parents, as is frequently true in trusts created for tax avoidance purposes. We are convinced that the other seven trustees were independent of the trustor-trustee who conveyed the property.

In determining whether the trustors are taxable under section 22 (a), a variety of factors and circumstances must be considered, no one of which is normally decisive, but all of which are relevant to the question of ownership. *Helvering* v. *Clifford*, 309 U. S. 331. It is established that each of the petitioners, prior to the conveyance in trust, owned the entire bundle of rights inherent in the ownership of the property transferred. We must decide whether, after the conveyance in trust, each trustor still retained, for all practical purposes, the ownership of that property.

After the conveyance no trustor could vote, pledge, alienate, or otherwise deal with his former Chandis stock. He could not receive cash or stock dividends thereon. He could not exercise individually any of the rights of ownership with respect to that stock which he enjoyed prior to the conveyance. He could not sell, invest, and reinvest the proceeds of any sale. He could not anticipate, assign, or alienate his present right to receive trust income. His sole power over trust income was to appoint the beneficiary or beneficiaries entitled thereto after his death. He had no right to "sprinkle" trust income during his lifetime, as the trustor was entitled to do in *Commissioner* v. *Buck*, 120 Fed. (2d) 775. He had no right, individually or as trustee, to withhold income in his discretion, to accumulate income for the remainderman as against the life tenant, to treat corpus as if he were the owner thereof, to hold trust assets without disclosing the trust, to remove trust assets to some other jurisdiction, or to exercise any unusual or extraordinary powers, as the trustor-trustee was entitled to do in *Louis Stockstrom*, 3 T. C. 255; affd., 148 Fed. (2d) 491. Here,

a trustor had no power of management or control over corpus or income whatever, as such power was vested in eight trustees who could exercise their power in many instances only by their unanimous agreement, and in any event only by a majority vote of such trustees. No trustor could at his pleasure control the acts of or remove any trustee. No trustor could amend, alter, revoke, or modify any provision of the trust indenture. Certain provisions of· the indenture could be modified by the unanimous action of the trustors during their joint lives, but no modification could be effective which directly or indirectly changed the duration of the trust or the initial character of the trust estate.

Respondent contends, however, that any attribute of ownership conveyed away by the individual trustors was vested in the family group, either as trustees or trustors, so that actually control and domination of the property and income continued unchanged. The powers granted the trustees do not support this contention. Paragraphs one to four of Article VI dealt with the trust corpus while it consisted of the Times and the Chandis stock, and, generally speaking, required the unanimous agreement of the eight trustees to act with respect thereto. Paragraph four provided for the management of the trust in the event that assets of a substantially different character were held by the trustees, a contingency which did not occur during any of the taxable years, so that the powers and discretions therein granted are inapplicable to the present issue. Paragraph six granted certain general powers and discretions to the trustees, except that the trustees should have no power or discretion to determine the nature of "all stock dividends" or "all cash dividends." The first, in the words of the indenture, "shall inure to or fall upon principal," and the other, "shall go to income of the Trust Estate." The powers and discretions vested in the trustees were fiduciary powers, which must be exercised in good faith for the benefit of the beneficiaries and not for the personal benefit or aggrandizement of the trustors. *Anthony J. Drexel Biddle, Jr.*, 11 T. C. 868.

Respondent also contends that the trustors, as a family group, retained dominion and control over corpus and income by reserving to themselves the power to modify the trust instrument. He reasons that by modification of the proper paragraphs of the instrument the trustors could take possession of the stock dividends. A brief examination of some of the trust provisions that would have to be modified under the reserved power will suffice to show that no such dominion and control was retained by the trustors.

In the first place, article I required that throughout the term of the trust the trust corpus should consist of "all of the shares of the capital stock of Chandis Securities Company delivered to the Trustees

hereunder." The stock dividends in question were preferred shares of Chandis and, by the provisions of article VI, inured to and fell into principal. Such dividends became and remained a part of corpus during the term of the trust. The provisions of article VI (2) show that the powers conferred upon the trustees by the trustors were to "be exercised only to maintain such a proportionate interest as is now represented in" the Times and Chandis companies. Reference to exhibit 2–B attached to the stipulated facts shows that the preferred stock carried voting rights of one and three-sevenths votes for each share of preferred, as compared to one vote for each share of common. Any amendment by the trustors as a group that distributed the preferred stock would, therefore, destroy the proportionate interest that the trust had in Chandis. Such an amendment would change the initial character of the trust and would exceed the limited power of modification reserved by the trustors.

Another reason which makes any joint action by the trustors on the above amendment unlikely is the adverse interest of Norman Chandler. His personal interests would undoubtedly lead him to object to any modification that would hurt his chances to assume the presidency of the Times. Without his consent, the other trustors would be powerless to modify the trust instrument in any particular.

A third deterring factor in making any such amendment was the rights of the remaindermen. As hereinabove pointed out, California law would not permit the trustors to terminate the trust upon the theory that they were the only interested parties. If the trustors could amend so as to distribute a part of the trust corpus, they could amend so as to distribute the entire corpus and thus terminate the trust. The law will not permit the trustors to accomplish by indirection that which they can not do directly. We are of the opinion that any remainderman could, by proper court action, prevent the trustors from distributing the corpus to the life tenants. *Bixby* case, *supra*.

What has been said with reference to article I and the modification thereof applies with equal force to the amendment of article III. That article provided for the distribution of the entire net income of the trust available in cash to the present beneficiaries. If the trustors had amended this article to require the distribution of all stock dividends, in addition to all cash dividends, then the situation would have been identical with that related above. With each distribution of stock dividends the trust's proportionate interest in Chandis would decrease. In view of the declared purpose of the trust, it can not be assumed that Norman Chandler would ever consent to any change or modification that was directly contrary to his interests. But if he consented, and if the trustors unanimously agreed to amend,

the amendment would still violate the express terms of the trust and would exceed the limited power of modification reserved in article IX.

Our findings show that during each of the taxable years trust corpus was increased by taxable stock dividends. It follows that the pro rata share of each trustor under the power of appointment retained in article III was increased. This power could be exercised during the trustor's lifetime, but was effective only at death. It could not be exercised to reduce corpus or income to the trustor's possession. It is suggested, however, that the power to appoint after death permitted the trustor to realize substantial economic benefits which can be taxed to the trustor under the broad sweep of section 22 (a). A similar contention was made and rejected in the *Bateman* case after the Circuit Court reviewed a number of Supreme Court cases, including the *Clifford* case and *Helvering* v. *Horst*, 311 U. S. 112. We hold, therefore, that the trustors received no such substantial economic benefits under their reserved power of appointment as would justify our taxing the stock dividends to them as realized income.

The *Klein* case, *supra*, upon which respondent relies, is distinguishable factually and legally from these cases. Our opinion therein distinguishes that case from the *Bateman* case and points out (p. 1201) that it is more analogous to the *Buck* case, *supra*. These cases are unlike the *Buck* and *Klein* cases.

In view of the foregoing, we hold that the stock dividends are not taxable to the trustors under section 22 (a).

Respondent's alternative contention, that section 166 or 167 applies, is not well founded. As we have hereinbefore pointed out, this is not a revocable trust. Nor is there any basis for holding that the trustors could, by joint action, work a forfeiture, when they could not, by direct action, terminate the trust and take over the corpus. It is equally clear, in our opinion, that the taxable stock devidends were not held, used, or accumulated for the benefit of the grantors. Such dividends became a part of trust corpus, which would be distributed to those entitled to take at the expiration of the trust. We hold that sections 166 and 167 are inapplicable. *Commissioner* v. *Bateman*, *supra*.

The final dispute between the parties is whether the policy announced in T. D. 5488, C. B. 1946–1, p. 19, and T. D. 5567, C. B. 1947–2, p. 9, amending section 29.22 (a)–21, Regulations 111, should be applied in this instance. The amendments, which apply only to taxable years beginning with or after January 1, 1946, were approved December 29, 1945, and June 30, 1947, respectively, and dealt with the taxation of trust income to the grantor within the principles of *Helvering* v. *Clifford*, *supra*.[1] In connection with the amendments, the respondent,

---

[1] The amendments need not be set forth in view of our disposition of this point.

by Mim. 5968, C. B. 1946-1, p. 25, and Mim. 6156, C. B. 1947-2 p. 13, stated that "it will be the policy of the Bureau, where no inconsistent claims prejudicial to the Government are asserted by trustees or beneficiaries, not to assert liability of the grantor for any prior taxable year under the general provisions of section 22 (a) of the Internal Revenue Code if the trust income would not be taxable to the grantor under the regulations as amended." (Mim. 6156.)

Petitioners contend that they are entitled to benefit from the foregoing statement of Bureau policy, even though the amendments are not retroactive. This contention is obviously in the alternative, although not so stated. In other words, if petitioners lose on the other contentions, they rely upon Bureau policy as above set forth. It is unnecessary to explore the arguments of the parties on this point in view of our conclusions on the other contentions.

For the reasons and upon the authorities mentioned above we hold that petitioners created a valid trust; that they are not taxable under section 22 (a) as construed by the *Clifford* case, *supra;* that the trust is not revocable within the meaning of section 166; and that the trust income, in so far as the stock dividends are concerned, was not held or accumulated for future distribution for the benefit of the grantors within the meaning of section 167.

The parties have stipulated the deficiencies and overpayments in income tax for the taxable years to be as follows in the event that we determine the stock dividends are not taxable to petitioners (the amounts shown in parentheses represent overpayments) :

| Taxpayers | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|
| May Chandler Goodan | $317.48 | $20,482.24 | ($50.91) | $240.32 |
| Marian Otis Chandler | 21,301.69 | 42.61 | 184.38 | 626.45 |
| Norman Chandler | 4,592.52 | 918.09 | 1,218.56 | 1,840.23 |
| Philip Chandler | (13.79) | 407.21 | 300.00 | 1,209.86 |
| Constance Chandler Crowe | 1,577.88 | 938.28 | 1,286.73 | 700.51 |
| Helen Chandler Garland | 133.03 | 59.22 | 582.38 | 16.20 |
| Ruth C. Williamson | 96.65 | 1,583.92 | (48.66) | 234.79 |

It is further stipulated and agreed, and the court may find as part of its decisions, that the deficiencies in amounts above stated were paid by the respective petitioners to the collector of internal revenue at Los Angeles, California, on December 31, 1946, with the following exceptions: in the case of May Chandler Goodan part payment of the deficiencies for the years 1938 and 1939 were [*sic*] made on June 30, 1944, in the amounts of $236.42 and $20,294.44, respectively, and the deficiency for 1941 has not been paid; in the case of Philip Chandler the deficiencies for the years 1939 to 1941 in the total amount of $1,917.07 have been reduced by the overpayment for the year 1938 of $13.79 and the net amount of $1,903.28 was paid on December 31, 1946; and in the case of Ruth Chandler Williamson deficiencies for the years 1938, 1939 and 1941, less an overpayment for the year 1940, were paid on December 31, 1946, as follows:

| | |
|---|---|
| 1938 | $96. 65 |
| 1939 | 5, 290. 50 |
| 1941 | 234. 79 |
| Total | 5, 621. 94 |
| 1940 | 48. 66 |
| Net amount paid | 5, 573. 28 |

It is further stipulated and agreed, and the Court may find as part of its decisions, that the overpayments above stated were made within three years before the mailing of the notices of deficiency or the filing of the petitions or the execution of consents under the provisions of section 276 (b) of the Internal Revenue Code or the Revenue Act of 1938, and that the notices of deficiency were mailed, the petitions were filed, or the consents were executed within three years from the time the returns were filed. (Section 322 (d) of the Internal Revenue Code and the Revenue Act of 1938, as amended by section 169 (b) of the Revenue Act of 1942 and section 509 of the Revenue Act of 1943.)

Reviewed by the Court.

*Decisions will be entered accordingly.*

---

KERN, *J.*, dissenting: I am of the opinion that the powers retained by the trustors by article IX of the trust indenture and specifically embracing the power to modify the provisions of article VI make this case more analogous to *Stanley J. Klein*, 4 T. C. 1195; affd., 154 Fed. (2d) 58, than to *Lady Marian Bateman*, 43 B. T. A. 69; affd., 127 Fed. (2d) 266; and, therefore, I respectfully dissent from the conclusion of the majority.

TURNER, MURDOCK, and DISNEY, *JJ.*, agree with this dissent.