COMMISSIONER OF INTERNAL REVENUE v. GOODAN et al., and six other cases.

No. 12550.

United States Court of Appeals Ninth Circuit.

March 5, 1952.

Fee, District Judge, dissented.

———◆———

Ellis N. Slack, Acting Asst. Atty. Gen., Helen Goodner, Louise Foster, Richard D. Harrison, Special Assts. to the Atty. Gen., Department of Justice, for petitioner.

A. Calder Mackay, Arthur McGregor, Howard W. Reynolds, Adam Y. Bennion, all of Los Angeles, Cal., for respondents.

Before STEPHENS and POPE, Circuit Judges, and JAMES ALGER FEE, District Judge.

PER CURIAM.

These are petitions to review decisions of the Tax Court of the United States entered in the above entitled matters. The opinion of the Tax Court, as originally promulgated, is reported at 12 T.C. 817. The decisions first entered pursuant to that opinion were vacated to enable the Court to consider a Motion to Reconsider. The order denying that motion was accompanied by a memorandum which appears in the margin.[1]

1. "Memorandum Accompanying Order. The principal ground for respondent's motion is that Bixby v. California Trust Company ([Cal.App.] (1948), 190 P.2d 321, cited and relied upon in our report, was reversed by the Supreme Court of California in Bixby v. California Trust Company, (1949,) 33 Cal.2d 495, 202 P.2d 1018, which was subsequent to the time this case was submitted to us. Respondent contends that under the California law, as restated by its Supreme Court in the 1949 Bixby decision, the present trust created no remainder interests in the heirs-at-law and the trust is revocable and terminable.

"In its 1949 Bixby decision the California Supreme Court clearly stated the general rule to be: 'Where the trustor is the sole beneficiary * * *, he can compel termination in the absence of a showing of incapacity or other reason why he should not be permitted to exercise control over his property * * *.' [Emphasis supplied]. And with equal clarity the California Supreme Court stated the following limitation or exception to the general rule: 'On the other hand, if remainder interests were created in plaintiff's [Bixby] heirs, they were also beneficiaries, and the court could not terminate the trust without their consent.' [Emphasis supplied].

"Whether remainder interests were created in the trustor's heirs-at-law is a matter of intent according to the California Supreme Court. And where the trustor creates a life estate in himself with a gift over to his heirs he ordinarily intends the same thing as if he had given the property to his estate; he does not intend to make a gift to any particular person but indicates only that upon his death the residue of the trust property shall be distributed according to the general laws governing succession, and he does not intend to create in any persons an interest which would prevent him from exercising control over the beneficial interest. See 33 Cal.2d 498, 202 P.2d 1019.

"Under well recognized rules of construction of written instruments all provisions of a trust indenture must be given consideration in arriving at the intent of the parties thereto. No trustor here provided for the termination of the trust on his or her death with gift over to heirs generally as in the Bixby case. On the contrary each trustor provided that upon his or her death trust income should go to a particular person, the spouse. In the event the spouse predeceased the trustor, the trust income was given to a particular class of persons, the issue. If no spouse and no issue survived the trustor then gave the trust income to the living heirs of the trustor until the termination of the trust. Similarly the trustor provided that upon termination of the trust the trust corpus was vested in and distributable to a particular class, namely, his or her then living issue, per stirpes; and if none survived, trust corpus was to go, upon termination of the trust, to the living heirs-at-law, the identity and respective shares to be determined by California law in force at the time of the trustor's death. It was only after the natural objects of the trustor's bounty ceased to exist that the California law of succession was to take its course.

"Nor could the trustors under the power of appointment reserved to them in Art. III of the trust instrument vest at death such an interest in the corpus as heirs generally take under California

The decisions were thereupon reentered and the petitions for review which are before us relate to the reentered decisions.

The questions presented upon such petitions for review, as stated in the petitioner's brief, were as follows:

"1. Whether the taxpayers who are the grantors, trustees and principal beneficiaries of the family trust involved here are subject to tax under Section 22(a) of the Revenue Act of 1938 and of the Internal Revenue Code on taxable stock dividends which were received by the trust in the taxable years and were added by the trustees to the corpus of the trust.

"2. Whether such stock dividends were taxable to the taxpayers herein as grantors of the trust under Section 167 of the Revenue Act of 1938 and the Internal Revenue Code."

Without considering whether in confining his argument before us to the two questions just quoted, the Commissioner would be deemed to have abandoned some of the points argued by him before the Tax Court, cf. Iob v. Los Angeles Brewing Co., 9 Cir., 183 F.2d 398; Western National Ins. Co. v. Le Clare, 9 Cir., 163 F.2d 337, 340; E. R. Squibb & Sons v. Mallinckrodt Chemical Works, 293 U.S. 190, 55 S.Ct. 135, 79 L.Ed. 279, the majority of the court are of the view that the opinion of the Tax Court, including the supplemental opinion which appears in the footnote hereto, was right, and that the decisions should be affirmed for all the reasons therein stated.

JAMES ALGER FEE, District Judge (dissenting).

The decision of the Tax Court, based upon its two opinions, is now affirmed by the majority per curiam. In each of these pronouncements, that court examined with meticulous insistence a collateral question of local California law which they are incompetent to decide. Local law should be left to the local courts, as this instance proves anew. After the Tax Court had rendered its first opinion, they were confronted squarely with another deliberate formulation of rule by the Supreme Court of California apparently diametrically opposed to the position which the majority of the Tax Court had taken in this case. Thereupon, they set aside their former decision, rationalized an explanation of the latest utterance of the highest court of California and smugly restored their former order.

The Tax Court should never have spoken upon a highly debatable question of local law. Notwithstanding the exhaustive but erroneous treatment of the local law upon which the Tax Court places the full weight of their final decision, I am told I cannot discuss the problem because the government did not argue the specific problem in their brief, but confined their attention to the applicability of § 167 (26 U.S.C.A. § 167). It is true the question of construction, which the California courts would place upon the document of so-called "trust," is collateral and extraneous. Even

---

law. This is so for the reason that Art. IV fixes the termination of the trust upon the death of the last survivor of 21 named individuals. Art. IV is irrevocable. Art. IX expressly prohibits the trustors from doing anything, directly or indirectly, that would terminate the trust prior to the expiration of the fixed term thereof, to vest the unrestricted ownership, use, possession and control of trust corpus in themselves or in their appointees, at or prior to the expiration of the fixed term of the trust. Should an attempt be made under the power of appointment to appoint corpus to heirs generally at death, the possession and control thereof would be held in abeyance until the death of the last

survivor of the 21 named individuals. Corpus could not pass at death to the heirs-at-law generally as the Supreme Court of California in the *Bixby* case said would be necessary to give trustors such rights of control as would make them in effect owners of the corpus. As the trustors could not vest the unrestricted use, possession and control of the corpus in their heirs-at-law at death, their appointees, whether heirs-at-law or others, would be in no better position under California law. In other words, the appointees take their interests subject to the terms of the trust agreement.

"For the foregoing reasons the decisions vacated August 15, 1949 will be reentered."

if it were valid, the question of whether the relationship was used to hold income for future distribution under § 167 was cardinal.

The holdings of the California courts could only have been properly used by the Tax Court to bolster up their decision (1) if this particular instrument itself had been submitted by petitioners to the local courts and had been specifically upheld. This has not been done. Or (2) if, by well established doctrine, the particular relationship had been passed upon and become a matter of established law, such as a partnership or a marital community. Even then, the question of whether the test of divested ownership or power to control income under § 167 would arise.

Not only was this obvious feature overlooked, but the Tax Court approved a relationship which has never been upheld by anyone, textwriter, judge, or court, at any time.[1]

Here the petitioners,[2] as stockholders, controlled the two corporations involved. They had the sole power to determine whether the earnings should be distributed as cash or as preferred stock in the first. As such majority stockholders, these eight, as grantors, transferred to themselves, as "trustees," so-called, the stock of which during their lives they constituted themselves sole beneficiaries. As a practical matter, notwithstanding expressions in the document, the majority stockholders, as grantors, retained complete control over the corporations and distribution therefrom as well as their own actions as "trustees." As a practical matter, notwithstanding the use of the word "irrevocable" in the document, the grantors retained complete power to dissolve the agreement by mutual consent of the eight, without more, and notwithstanding the clauses by which the beneficial interest would devolve upon certain persons or the "heirs" during life or lives in being, the beneficiaries had no interest according to the express words of the document, but the legal and equitable title was vested in the "trustees," who were the same identical persons who were grantors, and therefore were under absolute control of the grantors.

If the government is to be deprived of taxes by an instrument so drawn, it would seem the Court was at least entitled to examine its terms even if the agents of the government failed to argue the points which seem so clear upon a reading of the document. Otherwise, a manifest injustice might be accomplished.

Since the facts are not in dispute, a résumé thereof drawn from the opinion of the Tax Court is set forth in Appendix 1.

Executed long before the events here in controversy, the instrument in question was drawn with great care and meticulousness. The draftsman drives forward on a broad smooth path to the objective of absolute control of the property by the eight members of this family group. It is signed by the eight as individuals who transfer the stock, as transferors, and again by the same eight individuals as a group as transferees holding the stock in joint tenancy. Unquestionably, it is a valid contract with consideration binding mutually on the signatories

1. No case has been found where both the legal and equitable title has been given to a grantee and that grantee has been held to be a trustee. Where a trustee has the legal title, the beneficiary has the equitable title; where the trustee has only an equitable title, the beneficiary has an equity in an equity. Further, while merger is not affected by union of legal and equitable title, here the legal and equitable titles were never separated. If this transfer be upheld as a trust, there would seem to be no logical reason why a husband and wife could not declare themselves trustees of their property for themselves as beneficiaries. No court has yet held so illusory a transfer sufficient to constitute a trust.

2. The term "petitioners" is herein used to designate all the members of the Chandler family who sought to escape individual income taxes by petition to the Tax Court by virtue of their participation in the agreement summarized in Appendix 2. The Tax Court so designates them and, although the positions are here reversed, the designation preserves continuity.

individually. Until abrogated by unanimous agreement, it assures voting control[3] of the two corporations by the family group and a unity of management policy, a business purpose in the public interest. The provision which commits the management of the enterprise by unanimous agreement to Norman Chandler, as president and general manager, sets out a proper objective in business.[4] Great newspapers are thereby released under independent management from economic and governmental control to exemplify the freedom of the press, a cornerstone of our political system. But this is not the question here. It is necessary to decide only whether the stockholder-transferor-transferees shall assist in bearing the common burden of taxation, together with other persons who do not receive their income from amassed property. The fact that a business purpose was subserved is not alone controlling.

Of course, the Commissioner must concede that it is not improper to effect a tax saving if the regulations and the law are followed.[5] There is no evidence that there is any fraudulent purpose on the part of any party to the agreement. However, it is not essential to find an intent to defraud the government by allocation of property or income. If, in fact, sufficient control over the specific property be reserved, the courts will look to the realities of ownership and power over the res.

This primary instrument and relationship then concededly was for a legitimate business purpose. But the present issue of preferred stock was just as specifically for the purpose of minimizing taxes. The petitioners say in their brief: "By reason of the terrific increase in personal holding company surtaxes in 1937, * * *. The Chandis Securities Company [of which 35,394 shares out of a total of 38,288 were owned by the eight individuals, seven of whom are here petitioners] met this problem * * *. By authorizing the issuance of new preferred stock to the holders of the common stock, * * *."

The idea was then apparently conceived that these individuals, now petitioners, could, as stockholders, issue the preferred stock and pass it to themselves under the instrument and thereby escape individual taxation upon it. Since these individuals cannot do indirectly that which they cannot do directly, the tax was appropriately levied on the income of each, including the stock dividend.

Although no moral obliquity is thus charged, the issue of preferred stock was voted expressly for purpose of minimizing taxes upon Chandis, the personal family holding company in which no outsider held stock, and was effective for that purpose. The very purpose of the statute was to compel distribution of income to beneficiaries by such a holding company.[6]

There are thus raised four allied problems. Principally, it must be determined whether the clauses of the instrument bring this preferred stock within the definition of "income" set out in Section 22 of the Internal Revenue Act, 26 U.S.C.A. § 22. Second, assuming petitioners have established that there is a "trust" created by the instrument, did each of the petitioners part with the indicia of ownership and control sufficiently to escape taxation? Third, on the same assumption, it may be decided also whether power to revest title to any part of the corpus in the grantor is lodged in the grantor or in someone who has no adverse interest in the disposition of that part thereof or the income therefrom. Fourth, on the same assumption, it should be determined whether the authority to hold any part of the income or accumulate it

---

3. It was probably thought necessary to convey the title to the stock in order to establish a valid voting control. This may have had some influence upon the increased voting power given to the preferred stock. See generally 13 Am.Jur. 538, 542, Corporations §§ 504–506.

4. Higgins v. Smith, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659.

5. Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596.

6. Revenue Act of 1938, § 401, 26 U.S.C.A. Int.Rev.Acts, page 1129.

for future disposition to the grantors is placed in the discretion of the grantors or in any persons not having a substantial adverse interest in the disposition of this part of the income.

On the first point, petitioners claim that each has irrevocably parted with control of the property in such a manner that distribution cannot be made presently, but that the relationship is established without recourse, and that distribution can be made only after it has expired by limitation of time. There is extreme doubt about this thesis on the face of the agreement itself.

Each of these individuals, who is now suing for a return of taxes paid to the United States, has several personalities by the use of which, singly or combined, he has attempted to regulate the tax on his personal income. The capacities in which each acted are of stellar importance upon the cardinal question of ownership and control.

Each is a member of a strongly knit family group as well as a stockholder in the Times Mirror and in Chandis, the family holding company. Identity of interest is written in every line of this document. In addition to the personal relationship, there was complete control of the Times Mirror Company by this intimate group. These eight members of the Chandler family held stock in that company in the amount of 2,-034 shares. Besides, the stock of Chandis Securities Company was wholly owned by members of the family. The Chandis Securities Company owned 1,935 shares of Times Mirror stock. Only 1,738 shares of this stock were owned by others. With this form of control, dividends in cash or stock could be declared by these eight individuals. Cash distributed to any of these eight individuals by themselves was reported as income. The group absolutely controlled what they each would report as income, if these individuals are not required to pay on the preferred stock which they voted.

Each of these eight individuals transferred to the group, consisting of himself and seven other members of his family, the stock which aggregated control of each corporation. Under the instrument, they reserved to themselves, as a group, complete "legal and equitable title" of the property, including the control of each corporation. As a practical matter, there can be no question that the individual, as a member of the group, retained not only complete legal title of his own moiety, but he also immensely increased his power over the corporations as a whole by virtue of the unification of the voting block.

Each of these eight parties had the right to appoint corpus and income to take effect after death to anyone.[7] It is obvious this appointment might be either to his estate or to the grantors singly or in a body. In either of these events, it is clear appropriate provision could be made so that he could receive payment for his interest

---

7. Article III of the agreement. See Appendix 2.

"The general power presently exercisable is the practical equivalent of ownership, since it gives to the donee the power to acquire ownership at any time by appointing himself." 3 Restatement of Property 1813.

"If it is provided by the terms of the trust that the income shall be paid to him for life and that upon his death the principal shall be paid as he may by will appoint and in default of appointment to his heirs or next of kin, the fact that he has omitted to reserve a power to appoint in any way except by will is some indication that he intended to make his heirs or next of kin beneficiaries of the trust and to confer an interest upon them of which they cannot be deprived except by a testamentary appointment; but it is not of itself sufficient to overcome the inference that he intended to be sole beneficiary of the trust." Restatement of Trusts, § 127, Comment a.

"Where a person has a general power of appointment, whether by will alone or by deed alone or by will or deed, the donee of the power of appointment, even if he does not have an estate in the subject matter of the power, has such an interest as to make him in substance the owner of the property. If he makes an appointment of the property in trust, he is the creator of the trust; and ordinarily, if the trust fails, a resulting trust arises in his favor." Restatement of Trusts, §° 426, Comment a.

504

during his lifetime. As a practical result, complete control of his individual interest lay in each individual. The appointment would take the usufruct away from the designated remaindermen, spouses, issue and especially from the shadowy "heirs at law." No one of these would attempt to protect such a tenuous claim. In actuality, as to living persons such as spouses, the power of appointment deprives them of any interest. None has any property to protect. Under the agreement, the appointee, the spouse or the "heir at law" would become a "beneficiary," and no interest in the stock or other property held under the instrument "is or at any time shall be vested in any of the beneficiaries." [8] The eight signatories also insured against the contingency that the matter might be tested in the state courts of California by adding the clause in terrorem to the effect that anyone who sought to overthrow the arrangement should lose all "interest" therein. It may be this clause is invalid, but here we are considering practical effect. None of these eight individuals had any right as "beneficiaries", for "the interests of the beneficiaries shall at all times consist only and solely of the right to enforce the due performance" [9] of the agreement. As a matter of law then, there is no reason why those who agreed to these terms should not by unanimous agreement make a new contract tomorrow or in some period of low federal income taxes, if that time should arrive, and distribute the preferred stock as they see fit.[10] There is no one in a position to object. No one of the eight, as "beneficiary," could question what he had done by his concurring vote in the unanimous agreement of the eight who hold the legal and equitable title.

These eight individuals are specifically empowered, by their own agreement with themselves and the seven others, to receive and collect the principal and income of the trust estates and to pay, use and apply the income. As they may from time to time determine, they may distribute the "entire net income" received from the stocks and available in cash for distribution, determine in their discretion what is principal, gross income or net distributable income, and allot, partition and distribute stocks for such valuations and according to such method and procedure as they may determine upon and do so in kind or partly in kind and partly in money according to their valuation thereof.[11] In view of this provision, any agreement that they will not change the initial character of the estate is futile. What the eight agreed upon among themselves in the initial contract, they could change by unanimous agreement among themselves.[12]

In any event, as stockholders, the eight could unanimously vote to retire the preferred stock in some favorable year for taxation of individual incomes and accept the cash as a body and distribute it to the members.

But, if there is any doubt that distribution is left entirely at the discretion of the petitioners themselves, the following provisions dissipate it.

Article VI(1) provides the shares of stock of The Times "shall be sold * * * or otherwise disposed of * * * only by unanimous decision of the present or succeeding trustees."

Article VI(5) provides that the "trustees," if the shares of stock of The Times should be sold or otherwise disposed of, "are vested with the following additional powers and discretion: * * * The trustees shall have and are hereby vested with all the powers and discretions that an absolute owner of property has or may have."

Since the "trustees" are the identical eight individuals, it positively appears that, if they unanimously decide to sell the stock, they become absolute owners.

8. Article I of the agreement. See Appendix 2.

9. Article I of the agreement. See Appendix 2.

10. Restatement Contracts § 407, Comment a; Weber v. Alabama-California Gold Mines Co., 9 Cir., 121 F.2d 663.

11. Article IV of the agreement. See Appendix 2.

12. "Whenever two persons contract, no limitation self-imposed can destroy their power to contract again." Restatement Contracts § 407, Comment a.

Of course, if we look at only the things which the petitioners wish us to look at and which they have been at some pains to highlight in the instrument, we may be misled.

The principle is entirely clear that a person who has gone through a conveyance of property valid in form but which retains in him the complete control thereof with all the authority of ownership cannot set the transfer up against others who claim rights against him. Specifically, it is a principle of tax law that a person who goes through legal forms of transfer of property, but who retains complete domination thereof, cannot escape taxation thereby, whether or not his purpose in the transfer be fraudulent. If one cannot do it, eight cannot.

Thus, the contention of the Commissioner, that the preferred stock was income to each of these individuals under Section 22(a) of the Internal Revenue Act, was correct.

But the taxpayers insist that the tax cannot be levied upon this income in their respective hands because the ownership of all these preferred stocks was vested in them as "trustees" under this instrument, whereas, if the preferred shares had been distributed to them as individuals by themselves as "trustees," the taxes here in question would properly be due. This statement of the problem seems to answer itself.

However, it is strenuously urged that Congress has regarded trusts as separate taxable entities for income tax purposes,[13] and that, since a valid trust was created by the instrument under local law, no further search can be made for the realities. This postulate states a defense often made in tax cases.

The Tax Court decided squarely that the instrument created a valid trust under California law, and the Commissioner has assigned that determination as error. Certainly, the Tax Court seems to have assumed from the language used in the agreement that a trust was intended. Such assumption was unwarranted.[14] This particular instrument has never been brought before the courts of the State of California for adjudication.[15] There is no case in the books where the same individuals sign as transferors and transferees and are simultaneously stockholders in controlled corporations, transferors, trustees, beneficiaries and individually possessed of unlimited power of alienation to take effect at death, whereby ultimate distributees, according to law, can be cut off by the transferor. If the same individuals were not transferees and "trustees," this latter proviso might be upheld. The rationale of the decisions is that there can be no trust if the legal and equitable title to the property be merged in the trustees, as is expressly provided for in

13. 26 U.S.C.A. §§ 161, 162; Treasury Regulations 111, Section 29.22(a)–21.

14. Since the complete legal and equitable title is vested in the eight, there is no remainder. There is no interest in any beneficiary. There is no independent trustee. These features distinguish all the tax cases and particularly Marian Bateman, 43 B.T.A. 69, affirmed, 1 Cir., 127 F.2d 266, relied upon by the Tax Court. This feature adds weight to the principle announced in Klein v. Commissioner, 4 T.C. 1195, affirmed, 3 Cir., 154 F.2d 58, certiorari denied 328 U.S. 869, 66 S.Ct. 1380, 90 L.Ed. 1640. Commissioner v. Buck, 2 Cir., 120 F.2d 775.

15. The opinions of the California courts which uphold remainders of an entire trust estate to an indefinite class are not applicable. In each of the cases (1) the remainder of the corpus of the trust was involved, not the remainder

after a life estate in a share of the grantor in the property, (2) the instrument had been held under local law to create a valid trust, (3) the entire legal and equitable title was not vested in trustees who were identical with the grantors. The case most relied upon is Bixby v. California Trust Co., Cal.App., 190 P.2d 321, (4) the discussion hinges on the rule in Shelley's case, which relates exclusively to real property. Similar considerations apply to Gray v. Union Trust Co., 171 Cal. 637, 154 P. 306, where grantor reserved a power of appointment of the entire corpus of the estate to an indefinite class where the trustee was an independent corporation not under control of grantor. The authority of these cases has been weakened by the reversal of the Bixby case. Bixby v. California Trust Company, 33 Cal.2d 495, 202 P.2d 1018.

this instrument.[16] The cases generally hold that there can be no trust where the transferor has retained such control as to constitute the "trustees" as his agents in the distribution.[17] Here the "trustees" were the agents of the transferors and, besides, were the same identical individuals. The petitioners who had the burden did not establish that the instrument created a trust under state law. Therefore, they were not entitled to the special treatment accorded to beneficiaries of trusts under the statutes and regulations. The Tax Court went far afield in adjudicating this question of local law before the California courts had spoken.

The problem of whether this trust would be upheld by the state courts, however, is of no immediate consequence.[18] If it were upheld, the federal courts would still properly scrutinize the contract and the surrounding circumstances to determine wheth-er a tax was due.[19] There is no magic in a valid contract. If income is received thereunder, there must be a tax paid. Where a trust or partnership or other relation is created, the courts will look sharply on the transaction to determine whether the taxpayer still retains ownership and control of the property from which income is derived.

In Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, it was held that, where a grantor retained so many attributes of ownership that the creation of a trust had not caused any substantial change in his economic status and had permitted him to retain for all practical purposes most of the control which he theretofore possessed, he was taxable notwithstanding.

The application of this doctrine is clear when the power of the eight stockholder-grantor-trustee-beneficiaries,[20] as "trustees", in the matter of holding or distribu-

16. 151 A.L.R. 1287. Collins v. Mosher, 9 Cir., 115 F.2d 900, 902, certiorari denied 313 U.S. 581, 61 S.Ct. 1097, 85 L. Ed. 1537. The Court, in an opinion by Judge Stephens, said: "The trustees, if there is a trust, are the testatrix' children, William B. Lount and Hattie L. Mosher, the same two who are named as sole beneficiaries of the 'trust'. They are given full powers of management and control with power to dispose of any and all of the assets of the estate. The rents, issues and profits of the estate, and the proceeds of any sale or sales of properties are to be distributed to William B. Lount and Hattie L. Mosher in certain proportions, depending upon the source of the property sold. Such a bequest passes absolute title to the land itself. Kimberlin v. Hicks, 150 Kan. 449, 94 P.2d 335, 337; Lachmund v. Moore, 192 Iowa 980, 181 N.W. 4; Schnack v. City of Larned, 106 Kan. 177, 186 P. 1012, 1014; In re Franck's Estate, 190 Cal. 28, 210 P. 417, 418. This is in accord with the decision of this Court in the case of Collins v. Mosher, 9 Cir., 91 F.2d 582, 584, where we had under consideration the very same will with which we are here concerned. There we said, 'The will presents but little difficulty. The son and daughter are designated as trustees to carry out its provisions in respect of the management, sale, and disposition of the estate and the payment of certain contingent legacies and bequests; but after these duties shall have been performed the residue of the estate is given to them without condition.' "

17. 164 A.L.R. 881.

18. If the local courts were to accept the view of Scott on Trusts and of the Restatement of which he was reporter, that two persons can be grantors, trustees and beneficiaries of a trust instrument about which there is a serious conflict of authority, still that circumstance does not settle the questions raised by the unquestioned power of all parties to a contract to rescind or by the vesting of complete legal and equitable title in the transferors.

19. Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659; see Commissioner v. Tower, 327 U.S. 280, 287, 288, 66 S.Ct. 532, 535, 536, 90 L. Ed. 670.

20. As Hercules discovered in Hawthorne's tale of the "Three Golden Apples," if one catches the "Old Man of the Sea" and hangs fast through all his changes of shape, he will eventually resume his true form. Here, if one holds fast, one will always have the eight individuals who were and still are the legal and equitable owners of the property, who have entered into an agreement to control the corporation.

tion of the income, is considered. The "trustees" have power to change the form of the investment. They have power to sell the property or any part thereof. They have power to distribute the property. They have power to construe the language of the instrument. They have express power to modify the clause of the instrument which provides that stock dividends shall be part of the principal. As we have seen, the whole scheme might well be wiped out by mutual agreement.

The specific fact situation of the Clifford case does not confine the courts in dealing with new and allied problems. While the courts must recognize the barriers to application of a tax law which have been laid down by Congress, no use of established forms of trust or contract can be used to accomplish the evasion of duty to pay where a recipient of income has the full benefit thereof, whatever the vehicle by which he attains it.

As was pointed out by the minority of the Tax Court, "The powers retained by trustors by Article IX of the Trust Indenture and specifically embracing the power to modify the provisions of Article VI," vested in them individually such important attributes of outright ownership that they were shown to be owners of the stock dividends. Stanley J. Klein, 4 T.C. 1195, affirmed 154 F.2d 58.

The Tax Court says that the Commissioner does not contend that the arrangemen violates § 166 or § 167 of the Internal Revenue Code. A reference to the specifications of error herein shows that this specific objection is made as a counter to the claim of each petitioner.

If the possibility of distribution of the preferred stock as part of the corpus be considered, it will be found that specific provision is made therefor in the agreement. As shown above, the transferors have the power by collective action to distribute the corpus at any time. Furthermore, as was also shown, they have the power to sell the Times stock, and, immediately upon sale thereof, become vested with the

ownership of all the property, subject to no restrictions. They reserve to themselves the power to construe the instrument, and the construction given is binding upon all parties. Under these circumstances, since the basic instrument is an agreement among the eight, if they unanimously vote to abrogate the arrangement and distribute the corpus as a whole, there is no one to say them nay. No grantor can object because he is bound by his own action. By the terms of the instrument, no beneficiary can object because he has no interest, legal or equitable, and, besides, beneficiaries are the same persons who are grantors. If the "trustees" were independent persons, then perhaps the shadowy remaindermen might protest. As a practical matter, the clause in terrorem would prevent legal action by any of this class, and, besides, any of them could be cut off promptly by the power of appointment.

Now if indeed the preferred stock falls irrevocably upon capital, as petitioners contend, still it seems incontrovertible that power is here reserved to revest in the grantors title to a "part of the corpus of the *trust*" [21] if it be a "trust". But, if that be not true, the power to revest in the grantor title to a portion of the corpus was vested in persons "not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom".[22] The income consisting of the preferred stock should then be included "in computing the net income of the grantor." [23] This section deals with power, not with intent.

It is true no stress is laid upon the requirements of § 166 by the commissioner. However, his argument stresses the violation of § 167, relating to the distribution of income.[24] The holding above reinforces this approach. If it be held that the preferred stock is irrevocably capital, then the personal incomes can be taxed, as the argument above shows. The Commissioner argues that in any event the power is reserved to the grantors, as "trustees," to amend the instrument in such a way as to permit the

---

21. 26 U.S.C.A. § 166.

22. 26 U.S.C.A. § 166(1).

23. 26 U.S.C.A. § 166(2).

24. 26 U.S.C.A. § 167.

distribution of the preferred stock to themselves individually. It seems to be admitted by petitioners that this is a correct interpretation of the plain language of Article IX, as applied to this provision of Article VI, and that "stock dividends" could be treated as income distributable, if the "trustees" had modified the instrument and declared stock dividends income. But it is claimed such a modification is forbidden if it changes the "initial character" of the estate. Yet, if these preferred shares are stock dividends by definition, they do not change the moiety which each grantor holds in the corporations. If these shares carry a different voting power than the original shares, such a circumstance does not change the ownership of all or any one of the eight. If it does, the eight, as the majority, held control and included these terms according to their common interest. The initial character of the estate was neither changed by the receipt of the preferred shares nor would it be changed by a distribution thereof. The eight individually as "trustees" could have construed the instrument to mean that these preferred shares were not stock dividends but income and thereupon could have distributed them at any time they were available in cash.

It may be assumed no one would object. No one could object except the United States. But by that time the statute might be changed. The issue would be dead. Besides, if this case were decided, the matter would be res adjudicata.

It is urged that this was a determination of a question of fact by the Tax Court and therefore should be respected here. If that be so, it should be held that the findings on which the result is based are clearly erroneous. But both sides apparently agree as to all the facts and the whole course of the Tax Court's opinion and the briefs and arguments in this Court hinge upon the construction of the instrument and the statutes as questions of law.[25]

The enumeration of the powers that these individuals allotted to themselves under this voting control agreement and transferred to themselves jointly would take pages to enumerate. Besides, if the matter be considered realistically, there is no reason whatsoever that they cannot, at some future stage, either distribute the stock dividends or dissolve the trust. This agreement in this respect grants all powers, as did the "trusts" in the industrial field at the end of the last century. In some respects, the document might be compared to Thellusson's will,[26] as a result of which the rule against perpetuities was promulgated.

But we have no concern with this essentially. The taxes may not be escaped by the persons who own the property in the preferred stock, as do these persons.

The determination of the Tax Court should be reversed as to each petitioner.

## APPENDIX 1.

An instrument was signed June 26, 1935, by each petitioner herein and Harrison G. O. Chandler, who were all members of the Chandler family, as the transferors of certain stock hereinafter specified and by the same eight individuals jointly as transferees of the property. At no time since its execution has this instrument been altered, amended or modified.

"The trust involved herein, Chandler Trust No. 2 was created on June 26, 1935, by the execution of a trust agreement. The petitioners herein and Harrison G. O. Chandler executed the agreement as trus-

25. The Tax Court was deciding a point of local law, as is apparent by the fact that the first opinion and order were vacated after the reversal of the Bixby case, supra, and the supplemental opinion considering the reversing opinion and reconciling the rationale of the orders here appealed.

No consideration is given to the fact that the California courts might hold valid a limitation over of the corpus of the estate to an indefinite class where there was an independent trustee, but would not hold a trust was created where the entire legal and equitable title remained in the transferors jointly and no remainder was created. The California courts should be permitted to decide this proposition before it is accepted as a criterion in tax cases.

26. Thellusson v. Woodford, 4 Ves. 227, 11 Ves. 112.

tors and as trustees. At no time since its execution has the trust agreement been altered, amended or modified.

"Marian Otis Chandler is the mother of Harrison G. O. Chandler and the other six petitioners. At June 26, 1935, she was 68 years of age, her children ranged from 42 to 28 years of age, and her 13 grandchildren from 18 years to two months. All of the said individuals are living at the present time, except one grandchild, who died in June, 1943.

"The principal business of The Times is, and since 1881 has been, the publication of 'The Los Angeles Times', a newspaper with daily morning and Sunday editions. It has one class of stock, of which 5,760 shares were outstanding during the taxable years and for more than 10 years prior to June 26, 1935. At all times since 1884 a majority of the stock of The Times has been owned, directly or indirectly, by the father of Marian Otis Chandler, General Harrison Gray Otis, and his descendants. Immediately prior to execution of the instrument hereinafter described, on June 26, 1935, shares of stock of The Times were owned as follows:

| Name of Stockholders | No. Shares |
| --- | --- |
| Marian Otis Chandler | 1,634 |
| May C. Goodan | 50 |
| Ruth C. Williamson | 50 |
| Helen C. Garland | 50 |
| Harrison G. O. Chandler | 50 |
| Philip Chandler | 50 |
| Constance Chandler | 50 |
| Norman Chandler | 100 |
| Estate of Frances C. Kirkpatrick | 50 |
| Harry Chandler | 3 |
| Chandis Securities Company | 1,935 |
| Others | 1,738 |
| Total | 5,760 |

"Chandis, which was a personal holding company during the years involved herein, was organized in 1916. On June 25, 1935, its outstanding stock consisted of 38,288 shares of common stock. Of these, Marian Otis Chandler owned 16,536 shares, her seven living children and the estate of her deceased daughter each owned 2,694 shares, and Harry Chandler owned 200 shares.

Preferred stock of Chandis was first authorized and issued in 1937, and on December 31, 1941, there were 5,594 shares of such preferred stock outstanding. The purpose of Chandis in authorizing and issuing taxable stock dividends during the taxable years was to enable it to obtain dividends paid credits and at the same time retain a portion of its earnings in order to liquidate its outstanding obligations and those of its wholly-owned subsidiary, Southwest Land Company."

At the time the agreement was executed Marian Otis Chandler conveyed to the present trustees and their successors 16,536 shares of stock of Chandis Securities Company, hereinafter referred to as Chandis. Each of the other seven conveyed to themselves jointly under the terms of the agreement a certificate representing 50 shares of stock of The Times-Mirror Company, hereinafter referred to as The Times, and two certificates representing 2,694 shares of stock of Chandis.

The certificates of stock were endorsed by the respective eight individuals on June 27, 1935, and delivered to The Times and Chandis for cancellation. A new certificate representing 350 shares was issued by The Times and a new certificate representing 35,394 shares was issued by Chandis in the names of and delivered to the eight jointly under the instrument on June 27, 1935. From that date to the present time, the seven petitioners and Harrison G. O. Chandler have jointly held the certificates under the terms of the instrument.

The total property held by petitioners and Harrison G. O. Chandler under the agreement jointly during the taxable years consisted of "(a) a small amount of principal cash ($607.83 during 1938 and 1939, and $7.83 during 1940 and 1941), (b) 350 shares of stock of The Times, (c) 35,394 shares of common stock of Chandis, and (d) shares of preferred stock of Chandis as follows:

| | |
| --- | --- |
| December 31, 1937 ........ | 884 shares |
| December 31, 1938 ........ | 1,591 shares |
| December 31, 1939 ........ | 2,304 shares |
| December 31, 1940 ........ | 3,011 shares |
| December 31, 1941 ........ | 3,541 shares" |

The gross cash receipts and expenditures under the instrument for each of the taxable years were as follows:

The office expenses set forth above represented compensation paid for part time clerical services in keeping the books and records under the terms of the agreement.

"Gross Cash Receipts

|  | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|
| Dividends on Times stock | $26,950.00 | $32,374.00 | $35,000.00 | $ 35,000.00 |
| Dividends on Chandis stock | 62,918.30 | 54,343.81 | 62,501.23 | 77,692.39 |
| Total | $89,868.30 | $86,718.81 | $97,501.23 | $112,692.39 |

Expenditures

|  | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|
| Office expense | $ 303.40 | $ 295.80 | $ 299.86 | $ 295.80 |
| California State Income Tax | 6,292.03 | 4,420.00 | 4,420.00 | 4,617.76 |
| Total | $ 6,595.43 | $ 4,715.80 | $ 4,719.86 | $ 4,913.56 |
| Net | $83,272.89 | $82,003.31 | $92,781.37 | $107,778.83" |

During the taxable years petitioners and Harrison G. O. Chandler under the instrument jointly received on their Chandis common stock the following number of shares of Chandis preferred stock, which had a fair market value equal to its par value:

| "Year | Number of Preferred Shares | Fair Market Value |
|---|---|---|
| 1938 | 707 | $70,000.00 |
| 1939 | 707 | 70,700.00 |
| 1940 | 707 | 70,700.00 |
| 1941 | 530 | 53,000.00" |

On the theory that a "trust" had been created, Harrison G. O. Chandler and the seven petitioners reported these shares of preferred stock as if they were stock dividends.

| "1938 | $27,220.00 |
|---|---|
| 1939 | 17,942.00 |
| 1940 | 17,942.00 |
| 1941 | 26,404.40" |

The income taxes were paid with cash contributed by petitioners in accordance with their respective interests under the agreement.

The net cash income distributable and distributed under the terms of the agreement to the respective eight individuals, reported by them separately in their respective income tax returns and upon which they paid individual income taxes, was as follows:

| "Marian O. Chandler | $26,442.77 | $23,273.78 | $27,079.86 | $ 34,058.00 |
|---|---|---|---|---|
| May C. Goodan | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Ruth C. Williamson | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Helen C. Garland | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Harrison Chandler | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Philip Chandler | 8,118.57 | 8,389.89 | 9,385.93 | 10,527.69 |
| Norman Chandler | 8,118.59 | 8,389.89 | 9,385.93 | 10,527.69 |
| Constance C. Crowe | 8,118.58 | 8,389.89 | 9,385.93 | 10,527.69 |
| Totals | $83,272.87 | $82,003.01 | $92,781.37 | $107,778.83" |

The facts set out are all taken from the resume of the Tax Court and, where quotation marks are used, in the exact language.

APPENDIX 2.

"The agreement, after specifically naming petitioners and Harrison G. O. Chand-

ler as 'the Trustors,' as 'the present Trustees' and as 'the present beneficiaries,' provides in part and in summary according to the Tax Court as follows:

"Witnesseth

"That, Whereas the Trustors deem it to be for their best interest, and for the best interests of The Times-Mirror Company and the Chandis Securities Company, that there should be a continuity and stability of policy and management, and to that end that the interests of each of the Trustors in said corporations, as evidenced by the stock severally held by them, be united and vested in the Trustees, as hereinafter provided; and

"Whereas, the Trustors deem it also to be for their best interests that there should be held, conserved, administered and eventually distributed, according to the terms hereof, those assets which are respectively contributed by them to the Trust Estate;

\* \* \* \* \* \*

"Article I of the trust indenture segregates the trust corpus into two parts. It provides that one part * * * shall consist of all of the shares of capital stock of The Times-Mirror Company delivered to the Trustees hereunder, and the other part shall consist of all of the shares of the capital stock of Chandis Securities Company delivered to the Trustees hereunder and such division and segregation shall be continued throughout the term of this trust.

"The legal and equitable title to the trust estate was vested in the trustees and no interest therein 'is, or at any time shall be, deemed to be vested in any of the beneficiaries hereunder. The interests of the beneficiaries shall at all times consist only and solely of the right to enforce the due performance of this trust.'

"Article II deals with the gross income from the trust. It provides that gross income from each division of the trust estate (The Times stock and the Chandis stock) shall be charged with the taxes, costs, charges and expenses applicable to administering, protecting and distributing that portion of the trust estate. General and indirect costs, charges and expenses were to be allocated to the two parts as the trustees determined.

"Article III deals with the distribution of the net income. It provides that the 'entire net income received from the trust estate and available in cash for distribution, shall be paid in monthly, quarterly, or other convenient installments' as the trustees may from time to time determine the net income from The Times stock to be distributed in equal shares to the seven individuals who contributed that stock and the net income from the Chandis stock to be distributed during their lives, 16,536/35,394 to Marian Otis Chandler and 2,694/35,394 to each of the other seven trustors.

"Article III also provides as follows: There is hereby expressly reserved to each of the Trustors, during his or her lifetime, the absolute power of appointment and disposition of his or her share of the principal and income of the Trust Estate after his or her death, the same to be exercised not by Will, but only by the last written instrument exercising such power on file with the Trustees at such Trustor's death. Such power may be exercised, but only in the manner herein specified, from time to time, and each exercise thereof may be similarly revoked.

"Failing such appointment and disposition so on file at the time of trustor's death, the trust income to which a deceased trustor would have been entitled is to be distributed to his or her spouse for life, then to their issue, if any, then to the living heirs of such trustor, during their respective lives until termination of the trust. Similarly, the trustor's share of principal upon termination of the trust is vested in and distributed to his or her then living issue in equal shares, per stirpes, if none survived then to the living heirs-at-law, the identity and respective shares of which is to be determined by California law in force at the time of the trustor's death.

"Article IV provides that the trust 'shall cease upon, and in no event shall its duration extend beyond, the death of the last survivor of the following named persons, * * *'. The 21 persons named in the trust indenture were the eight trustors and

13 grandchildren, whose ages ranged from 68 years to two months, as above mentioned.

"Article V, entitled 'As to Trustees', provides that when the 'present Trustees' shall have been reduced to three in number, the survivors shall appoint and constitute additional trustees, so that there shall always be, except for temporary vacancies, seven trustees until the termination of the trust. The additional trustees were to be selected, so far as possible, from the then beneficiaries of the trust, 'giving preference to those who may be executives of' The Times and Chandis 'so long as shares of stock of the respective companies are held in the Trust Estate'. Other persons, including a bank or trust company, could be selected as additional trustees, but a majority of the trustees who were at the same time beneficiaries, could remove any or all of such other persons. Long continued absence from California or the County of Los Angeles, incapacity or inability to act constituted a valid reason for removal of any trustee by the remaining trustees, whether a beneficiary or not. Except in instances where unanimity or determination by trustees who are also beneficiaries is specifically provided, the decision of a majority of the trustees shall be deemed the decision of all. The trustees shall choose from their number a chairman and a secretary, one or more special custodians of funds or property, and one or more for the collection and disbursement of funds of the trust estate. The trustees were authorized to appoint other agents, depositaries, auditors, advisers, brokers, attorneys and other consultants. They were required to adopt rules of procedure for their meetings, keep records thereof, fix regular places and times for meetings with provision for notice thereof, all as they may from time to time determine in the efficient administration of the trust estate. The books of account, minutes of meetings and other records of the trust were to be subject to inspection to such extent as the trustees may from time to time determine.

"Article VI, entitled 'Powers of the Trustees', provides as follows:

"The Trustees are specifically empowered to receive and collect the principal and income of the Trust Estate, invest and reinvest the principal available therefor, and as hereinabove provided, to pay, accumulate, use and apply the income, and at the termination of the trust, to distribute the principal of the Trust Estate.

"To carry out the express purposes of this trust, and in aid of its execution, and the proper administration, management and distribution of the Trust Estate, the Trustees are vested with the following additional powers and discretions:

"(1) The shares of stock The Times Mirror Company, hereinabove described, and the shares of stock of Chandis Securities Company, hereinabove described, shall be sold, exchanged or otherwise disposed of only by the unanimous decision of the present or succeeding Trustees herein named; after the present and succeeding Trustees herein named are reduced to three in number, by the unanimous decision of the Trustees who are then beneficiaries hereunder;

"(2) Similar unanimity shall be required for a determination of the Trustees to borrow upon or pledge, or in any manner hypothecate or alienate or transfer or otherwise dispose of any interest in or to said shares. No portion, or less than the entire number of said shares, shall be sold, pledged, or otherwise disposed of, except in the event of such emergency that such partial disposition shall serve to avert the loss of the whole, or to protect the remaining shares.

"In aid of the determination to be arrived at by the Trustees in the situations herein contemplated, it is the Trustors' desire and request that the powers herein conferred, which are contingent upon the unanimous decision of the Trustees, shall be exercised only to maintain such a proportionate interest as is now represented in The Times Mirror Company and Chandis Securities Company, or in the event of an emergency, to protect as much thereof as may be possible under such circumstances;

"(3) It being the desire of all the parties hereto that Norman Chandler shall eventually succeed to the position of President and General Manager of The Times Mirror Company, the Trustees shall vote said shares for such Directors as will carry

out this desire. The unanimous decision of the Trustees shall be required in order to vote for such Directors as will not choose Norman Chandler as the President and General Manager of The Times Mirror Company, but if it should be unanimously determined that some one other than Norman Chandler shall be President and General Manager of The Times Mirror Company, then a decision by a majority of the Trustees shall be sufficient to choose his successor;

"(4) The unanimous decision of all of the Trustees shall be requisite to exercise the following powers with reference to the stock of The Times Mirror Company and Chandis Securities Company, so long as it shall constitute a part of the Trust Estate:

"(a) To vote for any increase of capitalization of The Times Mirror Company and/or Chandis Securities Company, which increase is proposed to be sold to the stockholders, or others, and not issued by way of stock dividend;

"(b) To vote for or consent to the incurring of any bonded indebtedness or other long term loan which requires the approval of stockholders, or shall be submitted to them;

"(c) To vote for or consent to any new classes of stock, or any reclassification of stock which might vary the rights of stockholders as to voting or other preferences;

"(d) To enter into any voting trust or other lawful agreement with other stockholders for the purpose of concentrating or unifying the control of stock of The Times Mirror Company and/or Chandis Securities Company, and to deposit shares under such agreement;

"(5) The Trustees, if the shares of stock of The Times Mirror Company and/or Chandis Securities Company should be sold or otherwise disposed of, or if there should be any liquidation, partial or otherwise, of the assets thereof, or a distribution to the stockholders thereof of any proceeds of sale as a result of which assets of substantially different character are received by the Trustees, then and in that event, but not otherwise, are vested with the following additional powers and discretions:

"(a) To retain such property and to continue to operate any business in connection therewith for such time as the Trustees may deem advisable or expedient;

"(b) To manage, control, sell, convey, exchange, or otherwise dispose of, or partition, divide, sub-divide, improve or repair such property and in connection with its disposal, to grant options and to sell upon deferred payments;

"(c) To borrow upon, mortgage, pledge, or otherwise encumber such property;

"(d) To lease such property, or any part thereof, for terms extending beyond the duration of this trust, and to grant for like terms the right to mine, or drill for and remove therefrom, gas, oil and other minerals;

"(e) Respecting bonds, shares of stock and other securities, notes, accounts and other choses in action, to have and exercise all the rights, powers and privileges of an owner, including (though without limiting the foregoing) voting, giving of proxies, payments of assessments and other sums deemed by the Trustees to be expedient for the protection thereof, assenting to corporate sales, leases and encumbrances, participating in voting trusts and pooling agreements, selling or exercising stock subscription or conversion rights, participating in foreclosures, reorganizations, mergers and liquidations, and in connection therewith depositing securities with protective or other committees, on such terms as the Trustees may deem expedient; to sue upon or otherwise enforce collection of any note or other obligation, or to compromise any claim or demand based thereon;

"(f) To invest such principal receipts as are in the form of cash in conservative securities to such an extent as the Trustees shall deem advisable or expedient, but such investment of cash shall not be limited to conservative securities if the Trustees shall deem that anyone or more of the following courses shall better protect the Trust Estate, or shall be more conservative as providing for a greater diversification;

"(1) To purchase property, whether real or personal, to such extent as the Trustees

may deem expedient or desirable, as providing protection from the possibility of monetary disorders or securities devaluations or deflations, or monetary or other inflation, or to avert or lighten onerous taxes or other Governmental charges;

"(2) To make such conservative loans or advances upon collateral or upon real estate for such term, either within or extending beyond the duration of this trust and at such rate of interest as the Trustees may deem to be for the best interests of the Trust Estate;

"The enumeration of those certain powers and discretions of the Trustees, as are set out in this Paragraph (5) shall not be construed as limiting the general powers and discretions herein vested in the Trustees, it being the intent of the Trustors that in the events provided for in this Paragraph, the Trustees shall have, and they are hereby vested with, all of the powers and discretions that an absolute owner of property has or may have.

"(6) Regardless of the character of the Trust Estate, the Trustees shall have the following general powers and discretions:

"(a) To determine in their discretion what is principal of the Trust Estate, gross income or net distributable income therefrom; except that all bonuses, royalties and recoveries from mines, gas or oil leases or wells, all stock dividends and proceeds of sale of stock rights and all gain or loss which may result from the payment, retirement or sale of stocks, notes, bonds or other securities, or on foreclosure or other realization upon mortgages and trust deeds, shall inure to or fall upon principal and all cash dividends (other than liquidating dividends stated in writing to be such by the corporation paying the same, or proved to the satisfaction of the Trustees to be such prior to its disbursement thereof) shall go to income of the Trust Estate. The net income from real property acquired by the Trustees on or by acceptance of conveyance in lieu of foreclosure, shall go to income of the Trust Estate. Brokers' or other commissions and expenses on purchase or sale of trust property shall be charged against principal;

"(b) To hold property of the Trust Estate in their own names, or in the names of one or more of their number, or in the name of their nominee, with or without disclosing such fiduciary relationship;

"(c) To appoint or employ servants, including agents, auditors, brokers, attorneys and other consultants and advisors, and provide for their compensation;

"Any Trustee who is not a beneficiary may receive such reasonable compensation for his services as Trustee, as the remaining Trustees may agree upon at the time of his or its appointment. Any Trustee may be compensated for any special or extraordinary or unusual services if such compensation shall be agreed upon in advance of the rendition of such services;

"(d) The Trustees may maintain and administer the Trust Estate undivided and as a unit, and shall not be required to make physical division or segregation thereof, except if, when and to the extent required to make distribution thereof, as in this trust provided, but the Trust Estate shall be deemed to be theoretically divided into as many units as there are beneficiaries and in proportion to their respective interest in the income;

"(e) To allot, partition and distribute the Trust Estate for such valuations and according to such method or procedure as the Trustees may determine upon, and to do so in kind, or partly in kind and partly in money, according to their valuation thereof;

"(f) To construe this agreement, and the construction of the same made in good faith shall be final, conclusive and binding upon all beneficiaries;

"All discretions in this trust conferred upon the Trustee shall, unless specifically limited, be absolute and their exercise shall be conclusive on all persons interested in this trust or the Trust Estate.

"Article VII, entitled 'Liabilities of the Trustees', specifies that the trustees assume no personal liability in respect of any action taken by them, except for his, her, or its own gross negligence or willful misconduct. It also provides that any trustee may be a member, shareholder, director,

officer or trustee of any other corporation, firm, trust or association with which the trustees may deal; may become pecuniarily interested in any matter or transaction to which the Trustee may be a party, provided the nature of such relationship is fully disclosed to the remaining trustees; may buy from, sell to, or deal with the trustees so long as a majority of all the trustees have notice of such interest of such trustee in the transaction and shall approve thereof. The trustees shall render to the beneficiaries an annual statement of receipts, disbursements and assets as soon after the close of the fiscal period as practicable. The approval of such account by the adult beneficiaries competent to act constitutes a full and complete acquittance and discharge of the trustees as to the transactions, receipts and disbursements reflected therein.

"Article VIII is entitled 'As to Beneficiaries.' It contains provisions restraining each beneficiary from alienating, anticipating, encumbering or in other manner assigning his or her interest, and other provisions common to so-called spendthrift trusts. It also provides in part as follows:

"If any beneficiary shall, either directly or indirectly, singly or in conjunction with other persons, seek to establish or assert any claim to the Trust Estate or to the income therefrom except as it herein specifically provided, or shall attempt to impair, invalidate or set aside any of the provisions hereof, or to have the same or any part thereof declared void or diminished, or to defeat or change any part of the plan of administration and distribution, as contemplated hereby, or shall attempt to settle or compromise, directly or indirectly, either in or out of court, with any persons seeking so to do, or shall consent or acquiesce in, or fail to contest such proceedings, then and in that event, anything to the contrary hereinabove stated notwithstanding, such person or persons shall thereupon cease to have any further interest or estate hereunder and the interest or share which would otherwise have gone to such person or persons shall go to augment the share or shares of those who shall not have joined in, assisted, consented to or acquiesced in such proceedings.

"The beneficiaries hereunder shall have no control or authority over the Trustees in any particular whatsoever, their entire interest hereunder being to receive the income, and at the termination of this trust, the principal, in the manner and to the extent determined by the Trustees. The acts of the Trustees and the powers and discretions herein vested, shall, except for lack of good faith, be conclusive upon all beneficiaries hereunder.

"Article IX is entitled 'General Provisions'. It provides that persons dealing with the trustees shall not be required to see to the application of the purchase money or other consideration passing to the trustees and were not required to see that the terms of the trust were complied with. The provisions of the trust agreement are declared to be severable, and the adjudged invalidity of any provision was not to effect the remaining provisions of the trust agreement. The concluding paragraph of Article IX provided as follows:

"This agreement and each and every provision hereof shall be, and is hereby, declared to be irrevocable and cannot be terminated by the parties hereto, by the beneficiaries hereunder, or by any court or otherwise, prior to the expiration of its full term, as herein fixed;

"Provided, however, that the Trustors, during their joint lives, have reserved, and do hereby reserve, the right by their unanimous agreement in writing and filed with the Trustees to modify, amend, construe, define or otherwise vary the terms of the provisions of Articles II, III, V, VI, VII and IX hereof, but no such modification shall be effective, directly or indirectly, to change the provisions as to the duration of this trust or the initial character of the Trust Estate, as provided in Articles I, IV, and VIII, the provisions of which last numbered Articles shall be in all respects and in each and every provision thereof be and remain irrevocable."